# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: November 2, 2020

| | |
|---|---|
| * * * * * * * * * * * * * | UNPUBLISHED |
| ALLA GOLDMAN, | |
| | No. 16-1523V |
| Petitioner, | |
| v. | Special Master Gowen |
| | |
| SECRETARY OF HEALTH | Ruling on Damages; Influenza |
| AND HUMAN SERVICES, | (Flu) Vaccine; Shoulder Injury |
| | Related to Vaccine Administration |
| Respondent. | (SIRVA). |
| * * * * * * * * * * * * * | |

*Richard Gage,* Richard Gage, P.C., Cheyenne, WY, for petitioner.
*Kyle E. Pozza,* U.S. Department of Justice, Washington, D.C., for respondent.

## RULING ON DAMAGES[1]

On November 6, 2016, Alla Goldman ("petitioner") filed a petition for compensation in the National Vaccine Injury Compensation Program.[2] Petitioner alleged that she suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of receiving an influenza ("flu") vaccination on October 23, 2015. Petition (ECF No. 1) at Preamble. Respondent initially invited a demand from petitioner, after which settlement discussions broke down and petitioner retained different counsel. Respondent then filed his report pursuant to Vaccine Rule 4(c) in which respondent opposed compensation. Resp. Report (ECF No. 23). After holding a hearing addressing both entitlement and damages, *see* Transcript (ECF No. 84), I issued a ruling that

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this opinion contains a reasoned explanation for the action in this case, I am required to post it on the website of the United States Court of Federal Claims. The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. **This means the opinion will be available to anyone with access to the Internet.** Before the opinion is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). An objecting party must provide the court with a proposed redacted version of the opinion. *Id.* **If neither party files a motion for redaction within 14 days, the opinion will be posted on the court's website without any changes.** *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act"). Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

petitioner was entitled to compensation on November 2, 2020.  Entitlement Ruling (ECF No 89).[3]

Following a full review of all the evidence submitted, I find that petitioner should receive an award for past pain and suffering in the amount of $75,000.00, future pain and suffering in the amount of $1,000.00 per year for her remaining life expectancy of 25 years, and life care plan items.  The basis for this determination is detailed below.[4]

## I.   Pain and Suffering

### A.  Legal Standard

The Vaccine Act provides that "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury," a petitioner may recover "an award not to exceed $250,000."  42 U.S.C. § 300aa-15(a)(4).  With regard to pain and suffering and all other elements of damages, the petitioner bears the burden of proof and the medical records are the most reliable evidence of petitioner's condition.  *See, e.g.*, *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *Shapiro v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 532, 537-38 (2011).

Prior to my appointment as a special master, former Chief Special Master Golkiewicz and others developed an approach with the goal "to fairly treat all petitioners" by "creat[ing] a continuum of injury", in which the statutory cap was reserved for the most severe injuries and lower awards were made for less severe injuries.  *Hocraffer v. Sec'y of Health & Human Servs.*, No. 99-533V, 2007 WL *914914, at *5 (Fed. Cl. Spec. Mstr. Feb. 28, 2007).  In *Graves¸* Judge Merow granted review of a special master's pain and suffering award, holding that the "continuum" approach was not "rooted in the statute or precedent".  *Graves v. Sec'y of Health and Human Servs.,* 109 Fed. Cl. 579, 590 (2013).  Judge Merow set forth a different approach in which the first step is to assess an individual petitioner's pain and suffering by looking to the record evidence, without regard to the $250,000 cap.  Only then as a second step, if the award would exceed $250,000, it must be reduced to that maximum.  *See id.* at 589-90.

In the Vaccine Program's subsequent history, special masters have of course not been bound by *Graves*.[5]  However, they have found it to be persuasive.  *See, e.g.*, *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *10 (Fed. Cl. Spec. Mstr. Moran

---

[3] The Ruling on Entitlement provides the procedural history and the facts which are also relevant to my determination of damages.  Those sections are incorporated fully herein.

[4] Pursuant to §300aa-13(a)(1), in order to reach my conclusion, I considered the entire record, including all of the medical records, statements, expert reports, medical literature and testimony presented at the entitlement hearing submitted by both parties.  This opinion discusses the elements of the record I found most relevant to the outcome.

[5] Decisions of special masters and the U.S. Court of Federal Claims constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998).  In contrast, the Federal Circuit's holdings on legal issues are binding on special masters. *Guillory v. Sec'y of Health & Human Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd*, 104 F. App'x 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

April 19, 2013) ("Under the interpretation of the statute offered in *Graves*, cases that used the spectrum approach, such as *Hocraffer* and *Long*, are no longer useful measuring points"); *Reed v. Sec'y of Health & Human Servs.*, No. 16.1670V, 2019 WL 1222925, at *12 (Fed. Cl. Chief Spec. Mstr. Dorsey Feb. 1, 2019) ("it must be stressed that pain and suffering is not based on a continuum"); *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224, at *5 (Fed. Cl. Spec. Mstr. Oler May 2, 2019) ("Pain and suffering is not, however, determined based on a continuum"); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069, at *13 (Fed. Cl. Spec. Mstr. Corcoran July 29, 2019) ("... special masters appear to have accepted *Graves*'s methodology since issuance of that decision... I will apply it herein as well, although I do so mindful of the need to consider the overall strength of petitioner's showing herein"), *motion for review granted and remanded on other grounds,* 147 Fed. Cl. 131 (2020); *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1364V, 2020 WL 5509686, at *3 (Fed. Cl. Chief Spec. Mstr. Corcoran Aug. 7, 2020) ("it must be stressed that pain and suffering is not based on a continuum"). I agree with this prevailing approach. I assess the full value of the damages in a particular case before me, then apply the statutory cap if that becomes necessary.

There is no mathematical formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D.*, 2013 WL 2448125, at *9 ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *Id.* at *9 (internal citations omitted). I find it appropriate to also consider any impairments in function and/or lost ability to participate in activities which the petitioner previously enjoyed, as a result of the injury.

A special master may also consider prior pain and suffering awards, especially for similar injuries, from both inside and outside of the Vaccine Program to aid the resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). A special master may also rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Any portion of a pain and suffering award that is found by the special master to be "future", must be reduced to net present value. *Youngblood v. Sec'y of Health & Human Servs.,* 32 F.3d 552, 555 (Fed. Cir. 1994), citing 42 U.S.C. § 300aa-15(a)(4)(a).

**B. Petitioner's Position**

Here, petitioner requests an award of $250,000 for past pain and suffering. Pet. Post-Hearing Brief at 2. Petitioner avers that her "life did not include constant pain" until developing SIRVA in October 2015. *Id.* Petitioner avers that her SIRVA involves "severely limited use of her left arm" that is severe, permanent, and impacts all aspects of her life. *Id.* Petitioner avers that: "Now she wakes up to pain, she lives with pain during the day, and she goes to sleep with

pain, which, if she rolls onto her left side, wakes her up during the night. She has constant 'background' pain. She simply lives with it. [Petitioner] has already suffered more than the $250,000 allowed by Congress in this Program." *Id.*

Petitioner argues that her pain and suffering will continue into the future because her "medical treaters have offered her no hope of a cure" and "[t]he only evidence before this Court is that [petitioner's] shoulder injury has been and will remain painful, with weakness and severely restricted use, for the rest of her life." *Id.*

Therefore, petitioner argues that if her past pain and suffering is not determined to reach the $250,000 cap, then she should be awarded future pain and suffering for years in the future, until the statutory cap is reached. *Id.* at 4, citing *Youngblood v. Sec'y of Health & Human Servs.,* 32 F. 3d. 552, 555 (Fed. Cir. 1994). "Petitioner would then, through an economist, reduce the future award to its net present value." *Id.* (citing 42 U.S.C. § 300-15(f)(4)(A)).

Petitioner allows that since approximately 2000, she has suffered from chronic regional pain syndrome (CRPS) (which is referred to in the medical records as chronic fatigue syndrome (CFS) and/or fibromyalgia). *Id.* However, she avers that her pre-existing condition is "not a defense" against her pain and suffering claim. *Id.* at 2-3. Rather, her SIRVA has "overlaid chronic pain on top" of her preexisting condition and "[i]f anything, her [preexisting condition] leaves her less able to compensate for her chronic left arm injury." *Id.*

Petitioner does *not* address her post-vaccination onset of symptoms in her mid- to low back and her lower extremities, which are not alleged in the petition and in fact are attributed to radiculopathy in the medical records.

Petitioner's post-hearing brief does not offer any citations to comparable cases that would support her claim to the maximum pain and suffering award.[6] In her post-hearing reply, petitioner avers: "Some guidance can be found in analogous Vaccine Program cases and in regular tort cases." Pet. Post-Hearing Reply at 5. However, she does not cite to any SIRVA cases from within the Vaccine Program. *See id.* at 5-6 (claiming that Vaccine Program awards "generally represent an undervaluation of pain and suffering damages" because respondent makes "low offer[s]" which many petitioners accept rather than waiting for decisions by special masters). Therefore, petitioner offers seven cases from outside of the Vaccine Program in which individuals sustaining shoulder injuries received more than $250,000, for either pain and

---

[6] The only case citations are to other special masters' application of the *Youngblood* rule. Pet. Post-Hearing Brief at 5. First, petitioner cites to Special Master Moran's apparent use of the *Youngblood* rule in two orders in the case of *Anthony v. Sec'y of Health & Human Servs.*, 14-680v. These orders were not publicly posted on the Court's website and my research indicates that the case was resolved via proffer. *See Anthony*, 14-680v, 2016 WL 1169147 (Fed. Cl. Mar. 2, 2016). Mr. Richard Gage, petitioner's counsel in this case, also represented the petitioner in *Anthony*. But he fails to note that in *Anthony*, while the special master used the *Youngblood* rule, the pain and suffering award still did not reach the statutory cap.

Second, petitioner cites to former Chief Special Master Dorsey's apparent use of the *Youngblood* rule in *Schettl v. Sec'y of Health & Human Servs.*, a case in which the vaccine injury was in fact CRPS, not SIRVA. *See Schettl*, No. 14-422V, 2019 WL 664493 (Fed. Cl. Chief Spec. Mstr. Dorsey Jan. 22, 2019). Accordingly, I do not find these cases to be helpful reference points for determining the amount of pain and suffering for petitioner's SIRVA injury.

suffering alone or as a settlement.  While these cases present interesting factual scenarios and not surprisingly large awards, they are readily distinguishable from petitioner's case. In every case the plaintiff either underwent surgical intervention or was told that surgical intervention was unlikely to resolve the injury.  *Id.* at 6-9.  One plaintiff was a 37-year-old woman who experienced injury to the dominant arm and brachial plexus, thoracic outlet syndrome, and scapula thoracic dissociation.  The jury heard testimony from her treating physician that she "was unlikely to improve even with corrective surgery".  A state appellate court upheld the jury award of $50,000 for past pain and suffering and $450,000 for future pain and suffering. *Garrow v. Rosettie Assocs. LLC,* 875 N.Y.S.2d 307, 308-09, 2009 WL 537065 at *1126-27 (N.Y.A.D. 3 Dept. March 5, 2009).  Another plaintiff sustained a work-related unspecified injury to his right shoulder and settled with his employer for approximately $47,000.  He then underwent corrective surgery to the shoulder from which he developed a bone infection.  He settled a medical malpractice claim against the surgeon for approximately $300,000.  *Merrick Printing Co. v. Vertrees*, 2003 WL 21839125 (Ky. App. 2003.  Another plaintiff's claim related to a severe shoulder fracture which required four corrective surgeries.  A jury awarded over $2,000,000 before a state appellate court reversed the liability determination.  *Griffin v. Univ. of Pittsburgh Med. Center-Braddock Hosp.*, 950 A.2d 996, 2008 PA Super. Ct. 104 (2008). Another plaintiff underwent three corrective surgeries culminating in fusion of the shoulder joint. A jury awarded $700,000 which included loss of earning capacity.  *Fruge v. Foret*, 134 So. 3d 152, 153, 2013-1071 La. App. 3 Cir. (2014).  Another plaintiff, who brought a medical malpractice claim relating to a screw which was misplaced within her shoulder, underwent corrective surgery and subsequently developed reflex sympathetic dystrophy.  She received a total award of $500,000.  *Schaffer v. Roberts*, 650 N.E. 2d 1341, 1342 (Ind. App. 1995). Another plaintiff, who also alleged medical malpractice, underwent corrective surgery. Afterwards, she continued to experience constant excruciating pain in the right shoulder and arm, which was "permanently deformed and hangs twisted".  She was awarded $400,000.  *Dawes v. Kinnett*, 779 So.2d 978, 985, 1999-3157 La. App. 4 Cir. (2001).  The last plaintiff, who also alleged medical malpractice, underwent three corrective surgeries but still had an "obvious… tear" in the infraspinatus tendon.  The plaintiff was awarded $580,000, approximately half of which was for pain and suffering.  *Pollak v. Goldman*, 2008 WL 5452132 (Cal. App. 2 Dist., 2008).

Petitioner does not state why these cases are comparable to her own, in which she refused cortisone injections and surgery in favor of more conservative treatment in the form of physical therapy and chiropractic adjustments, for an injury which frequently responds well to steroid injections and in particular to surgical release of the adhesions in the shoulder capsule.  She also states: "Ultimately, it is up to the Special Master to use his best judgment based on the specific facts of each case."  Pet. Post-Hearing Reply at 9.

## C.  Respondent's Position

Respondent avers that the facts of this case and the pertinent legal and policy considerations support an award of between $30,000 to $60,000.  Resp. Post-Hearing Response at 16.  Respondent avers that petitioner's SIRVA is not particularly severe because the medical records show that petitioner's past and future treatment "essentially consists of physical therapy

and occasional pain medicine for her non-dominant shoulder". *Id.* at 16. Respondent notes that petitioner has not undergone surgery or received steroid injections. *Id.*

Respondent also avers that petitioner's SIRVA does not significantly contribute to her overall disability. Respondent highlights the previous determination that petitioner was unable to work and qualified for SSD payments on account of her prior fibromyalgia, headaches, and insomnia. *Id.* Respondent cites to petitioner's 2000 SSD ADL Questionnaire as documentation that she had a long-documented history of restrictions and that most of the household tasks were performed by her husband with occasional hired help. *Id.* Respondent avers that although petitioner testified that she was doing some cooking and light cleaning in the year before the vaccination, that was not supported by the rest of the record. *Id.* at n. 10.

Respondent also avers that petitioner's pain management physician Dr. Ramundo, who testified at the hearing, conceded that many of petitioner's current complaints, such as difficulty walking more than two blocks and tying her shoes, are related to her lower back rather than her shoulder. *Id.* at 16, citing Tr. 49-50. Respondent also avers that even if petitioner did develop SIRVA following the October 2015 flu vaccination, she was "able to perform all of her ADL without pain prior to the onset of her low back pain". *Id.* at 16, citing Tr. 50:8-12; Gage Ex. 10 at 39-43. Respondent avers: "For this reason, no award for future pain and suffering is warranted." *Id.* at 18 n. 11.

Respondent avers that: "Petitioner does not cite any decision in which a similarly-situated petitioner was awarded the statutory cap in a non-surgical SIRVA (presumably because it does not exist)." *Id.* at 17.

Respondent avers that "the median proffer in SIRVA cases is $95,000.00, but this number includes cases in which the damages are not necessarily delineated into amounts for pain and suffering, lost wages, and expenses." Resp. Post-Hearing Response at 17, citing *Wilt v. Sec'y of Health & Human Servs.*, No. 17-73v, 2020 WL 1490757, at *11 (Fed. Cl. Spec. Mstr. Feb. 24, 2020) (in which Chief Special Master Corcoran discusses the SIRVA cases resolved since the SPU's inception in July 2014 to January 1, 2020 and specifies that: "Since late 2017, the government's proffer has included subtotals for each type of compensation awarded").[7] Respondent avers that an award of $60,000.00 to $90,000.00 is appropriate for "petitioners who displayed mild to moderate limitations in range of motion and MRI evidence likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema." Resp. Post-Hearing Response at 17, citing *Wilt*, 2020 WL 1490757, at *12 (listing the SPU's *reasoned opinions* awarding between $60,000.00 to $90,000.00 for *only actual or past* pain and suffering).

Despite citing to past reasoned opinions, respondent then avers that: "Comparisons to 'reasoned' SIRVA damages decisions are becoming less and less helpful in resolving SIRVA cases for several reasons. The reasoned damages decisions in SIRVA cases offer just a small sampling of the SIRVA cases adjudicated in the Vaccine Program. In fact, hundreds of cases

---

[7] *See also Tumolo v. Sec'y of Health & Human Servs.*, No. 16-343V, 2020 WL 6279711, at *10 (Fed. Cl. Spec. Mstr. Oct. 1, 2020) (in which former Chief Special Master Dorsey provides the update that as of July 1, 2020, among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,000 to $120,0289.48, with the median award at $93,860.82).

have been proffered by respondent at their full value, accepted by petitioners as fully compensating them for their damages, and then determined by the special masters as representing the full value of their damages claims since SIRVA was added to the Vaccine Injury Table."  Resp. Post-Hearing Brief at 18-19.  Respondent avers that special masters should use their expertise which "includes taking into account the vast number of prior awards that were proffered at their full value and determined by the special masters as fully compensating SIRVA petitioners for their pain and suffering damages."  *Id.* at 19.

I tend to agree that successful past proffers in which pain and suffering is separated out, rather than lumped in with other categories of damages, may serve as helpful comparisons. However, these proffers are often submitted in cases where the respondent has conceded or not contested entitlement of the SIRVA claims.  Accordingly, there are not publicly available, reasoned opinions that allow a non-party to understand the underlying facts.  Without questioning respondent's summary of the facts in these cases, I will repeat that pain and suffering is a subjective assessment.  In the case where the parties disagree about the degree of pain and suffering, the petitioner will very likely submit additional pertinent evidence and testimony. Accordingly, where there is a difference between awards via government proffer and awards via reasoned opinions, the latter should be entitled to more weight.

Respondent then offers an appendix of fifty-five (55) cases involving "shoulder impingement" and "shoulder bursitis" in the civil tort system which were resolved by either jury verdict, arbitration, or settlement, over the past five years.  Resp. Post-Hearing Response – Appendix A. Respondent avers: "The average[8] pain and suffering award… is $33,089.93. Nearly seventy-five percent of the pain and suffering awards… are for $30,000 or less, several of which went to plaintiffs who underwent surgery, and nearly half of the awards are for $10,000 or less.  All of the awards over $30,000 involve concurrent knee or back injuries.  Indeed, this review of awards for comparable injuries suggests that the Vaccine Program's pain and suffering awards for straight shoulder injuries are substantially higher than what is typically awarded in the traditional tort system."  Resp. Post-Hearing Response at 20-21.

In her reply, petitioner avers that these cases are not helpful because they lack information about severity and duration.  Pet. Post-Hearing Reply at 6 (citing *Rafferty v. Sec'y of Health & Human Servs.,* No. 17-1906V, 2020 WL 3495956, at *18 (Fed. Cl. Spec. Mstr. May 21, 2020) (finding unhelpful respondent's presentation of "cursory information regarding how these cases were chosen, some basic information about the type of injury suffered, but no information regarding the severity and duration of these injuries").

### D.  Usefulness of Cited Cases from Outside of the Vaccine Program

I do not find the submissions of cases outside of the Vaccine Program as references for the valuation of SIRVA cases to be particularly helpful for several reasons.  Approximately ninety per cent (90%) of personal injury cases are settled and rarely appear in reports of verdicts.

---

[8] Respondent presented the *median* award for SIRVA cases resolved by proffer above but cites the *average* award for these 55 jury verdicts and settlements.  Without calculating the median of the outside awards to assess whether this changes the outcome dramatically, it is merely noted that respondent is not presenting a direct comparison between these two sets of cases.

The vast majority of jury verdicts are not appealed and thus are not discussed in appellate opinions such as those cited by petitioner. And as noted above, the cases cited by petitioner here are readily distinguishable in terms of severity. Each case reported injuries, disabilities and surgeries that appeared to far exceed the comparable injury at issue in this case. Tort claims also involve considerations of fault which may serve to increase or decrease the awards at issue.

On the other hand, the respondent's summaries of fifty-five (55) selected cases involving shoulder injury are not very helpful either. Each of the short case summaries, nearly all of which arose from automobile accidents, contains a "JVR" number. JVR stands for Jury Verdict Research which is a voluntary reporting service with which I am familiar.[9],[10] It has some of the same limitations as the cases cited by petitioner, in that it contains reports of verdicts by juries or arbitrators and not the larger data set of settlements. Additionally, the JVR data set also suffers from its sourcing in that it tends to contain reports from plaintiff's lawyers anxious to publicize large verdicts and defense lawyers wanting to show particularly small ones. Given the brief descriptions[11] of seemingly significant injuries preceding the awards, which as respondent noted were in the majority under $10,000, the low verdicts appear likely to have come from an insurance defense source. They appear to greatly undervalue the described injuries and likely involved considerations not at issue in vaccine cases.

Petitioner argues in this case, as do other petitioners in the Vaccine Program, that the SIRVA awards of compensation according to the respondent's proffer are artificially low because the respondent has declared itself the arbiter of ultimate values for settlement and is often unwilling to negotiate, which forces many petitioners to accept less that what they consider fair value for their cases. This argument is not without merit in some cases. It would be helpful in those cases if the respondent would engage in further negotiations to reach a settlement. However, it is folly for petitioners to suggest that the same dynamic does not occur in civil tort cases where insurance carriers "low-ball" cases in the hope that plaintiffs in need of money will accept less than fair value. Certainly, it is quite common that plaintiffs and insurance carriers have different views of the settlement value of cases.[12]

---

[9] In my prior career in civil litigation, I subscribed to this service for a period of time and was able to assess its usefulness. For the reasons described above, I found this service to be a source of anecdotal information but an unreliable indicator of case values.

[10] Thomson Reuters has acquired JVR. Thomson Reuters also owns the legal research database Westlaw. Respondent used the Westlaw Jury Verdicts and Settlements Database, which houses the Jury Verdict Research data, to prepare its Appendix A of cases with JVR numbers.

[11] For example, for case 4, in which the plaintiff was awarded $1,500, the summary is: "Car accident, injury to passenger. Type II glenoid labral tear, rotator cuff tear and bursitis of left shoulder which required surgery and resulted in permanent impairment, as well as cervical, rotator, and lumbar strains." Resp. Post-Hearing Brief, Appendix A at 2. For case 7, in which the plaintiff was awarded $3,000, the summary is: "Car accident. Cervical disc protrusion, acquired loss of cervical lordosis, concussion leading to post-concussion syndrome, shoulder AC joint separation with impingement, and cervical, thoracic, and lumbar strains." *Id.* For case 4, in which the plaintiff was awarded $4,000, the summary is: "Car accident. A proximal humerus fracture, left shoulder impingement, and cervical disc herniations at C4-C7". *Id.* at 3.

[12] It is also noted that within the traditional tort system, the plaintiff's attorney's contingent fee is subtracted from any award. In contrast within the Vaccine Program, if the petitioner is awarded compensation, he or she actually

Further, the amounts of civil verdicts are greatly affected by the geographic location of the trial. Verdicts vary significantly from county to county within a given state and even more so from state to state. In contrast, the Vaccine Program has national jurisdiction and the assessment of a petitioner's damages, particularly pain and suffering, is based on the evidence submitted without regard to the petitioner's location.

Vaccine injury claims do not involve consideration of fault which may tend to increase or decrease case value. Additionally, all SIRVAs occur by the same mechanism and generally resemble one another (although their severity and duration can vary and they can affect different petitioners in different ways). To the extent that viewing comparative values is useful as a test of subjective valuations, I conclude that past determinations of pain and suffering for SIRVA claims – particularly those determinations based on reasoned opinions by special masters – tend to be the most useful. However, the petitioner carries the burden of proof to establish his or her pain and suffering. Any petitioner who requests that I determine the appropriate amount of pain and suffering to be awarded for his or her injury will be required to submit supporting evidence. This can include citation to past *reasoned* opinions which he or she believes to be helpful comparisons to his or her own case. Respondent is welcome to do the same. That being said, my ultimate valuation in a specific case is based upon my evaluation of the evidence in that case, including the medical records, the testimony, the treatments involved, the duration of the injury, the description of pain, whether the SIRVA is in the dominant or non-dominant arm, the limitation of motion, and the impairment of function involved.

### E. Discussion and Conclusion

As noted above, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9. Impairment of function and loss of activities are also considered. Here, petitioner's awareness of her injury is not disputed. The record reflects that at all relevant times, petitioner was a competent adult with no impairments that would impact her awareness of her injury. Thus, the focus must be on the severity of her injury, its duration, and any impairments in function and loss of activities.

Petitioner testified that for the first few months after the October 23, 2015 vaccination, her left shoulder pain was "extreme" and in her characterization eleven out of ten. Pet. Post-Hearing Reply at 10, citing Tr. 59. However, this is not supported by the contemporaneous medical records. First, petitioner did not seek medical attention for her left shoulder for nearly three months, until a January 12, 2016 appointment with her primary care provider Dr. Smith. Pet. Ex. 2 at 75. This pain rating of eleven out of ten for several months would appear to be an embellishment, as it is most unlikely that a person would endure pain at that level for more than a few hours, much less for two and a half months, without seeking medical treatment.

---

receives the full amount of the award. The Vaccine Program separately pays "reasonable" attorneys' fees and costs for proceedings on any petition for which compensation is awarded in addition to the award to the petitioner

In the ruling on entitlement, I found that there was preponderant evidence that petitioner experienced left shoulder pain within 48 hours, although she delayed treatment.  I found reasonable petitioner's explanation that at first, she hoped her pain would go away and that the winter holidays also contributed to some delay in scheduling an appointment with Dr. Smith.  However, here I find that petitioner's delay in seeking treatment – either with her established provider or an urgent care facility – remains relevant in considering the severity of her condition.[13]  When Dr. Smith saw petitioner for the first assessment of shoulder pain, he recorded that she had difficulty carrying out daily tasks, had no relief with Tylenol, and had tenderness and limited range of motion.  He did not record her pain along a scale of one to ten, but he prescribed the prescription NSAID meloxicam.  Pet. Ex. 2 at 75-76.  The physical therapy records beginning in March 2016 reflect that petitioner's pain was at best six out of ten and at worst eight out of ten.  Pet. Ex. 4 at 91.

Around the time, on March 30, 2016, petitioner underwent an MRI of the shoulder which revealed "findings suggestive of adhesive capsulitis".  Pet. Ex. 3 at 23.

By late summer or fall 2016, petitioner's baseline pain had decreased to about three or four out of ten although it worsened with activity; her primary complaint at this point was the weakness arising from decreased use of the shoulder.  *See, e.g.*, Pet. Ex. 5 at 7; Pet. Ex. 7 at 7, 23.  Petitioner's pain also tended to increase when she missed physical therapy.  *See, e.g.*, Pet. Ex. 8 at 8, 12.

Beginning in December 2016, petitioner's pain picture included not only her left shoulder but also her low back and lower extremities.  Petitioner consistently reported that *both* shoulder pain and back pain were interfering with her sleep and disrupting different activities of daily living.  *See, e.g.*, Pet. Ex. 8 at 1, 12.  Petitioner underwent a physical therapy reexamination for both problems in April 2017, *see* Pet. Ex. 9 at 4-5, and began chiropractic treatment for both problems in August 2017, Pet. Ex. 11 at 1-3.  By December 2017, the chiropractor recorded that petitioner had near-normal range of motion with only "mild pain".  Pet. Ex. 11 at 47.  His subsequent records reflect continued treatment but no further physical examinations of the shoulder, suggesting that it was stable and less of a concern than her continued back complaints.  *See generally* Pet. Ex. 11 at 49-70; Pet. Ex. 13; Pet. Ex. 21.  During this same time period, Dr. Ramundo recorded that petitioner's shoulder pain was at best four out of ten, but at worst with activity nine out of ten.  *See, e.g.*, Pet. Ex. 10 at 27, 39.  But by the entitlement hearing in May 2020, petitioner testified that her shoulder pain is at best two or three out of ten and worsened with activity to five or six out of ten.  Tr. 70-72.

Treatment can also illustrate the severity of an injury.  Here, viewing the record as it stands five years after the onset of petitioner's SIRVA, petitioner has been fairly compliant with physical therapy, despite certain gaps due to reaching Medicare's limitation on reimbursement, her mother passing away, and the winter holidays.  Petitioner has also pursued chiropractic treatment.  She took NSAIDS, both over-the-counter medications such as Aleve and the

---

[13] *See, e.g.*, *Marino v. Sec'y of Health & Human Servs.*, No. 16-622V, 2018 WL 224736, at *8 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (former Chief Special Master Dorsey's reasoning that "the fact that Ms. Marino delayed seeking treatment is relevant to the value of her claim but does not defeat her claim").

prescription medication meloxicam when the pain was more severe.  Petitioner explained that with meloxicam, she has experienced side effects such as nosebleeds and nausea.  Tr. 67; *see also* Pet. Ex. 14 at 19.  She now prefers to take homeopathic medications such as Boswellia, B complex, and turmeric root extract, which she believes are helpful with the pain and inflammation.  Tr. 67-68.

Petitioner has refused other treatments for her SIRVA.  Namely, she has refused steroid injections because she is terrified of needles, "especially knowing that all this [presumably her SIRVA] started with a simple needle".  Tr. 94.  Her understanding was that any steroid injection would provide only temporary relief and would need to be repeated.  Tr. 94-95.  In addition, several treating providers raised the possibility of surgical intervention early in her course, but petitioner declined.  Pet. Ex. 19 at 3 (July 11, 2016 record by Dr. Ramundo); Pet. Ex. 2 at 3 (August 16, 2016 record by Dr. Smith); Gage Ex. 10 at 9 (July 10, 2017 record by Dr. Ramundo).  Petitioner's medical records reflect a diagnosis of adhesive capsulitis.

SIRVA often involves initial inflammation and pain, which in some cases leads to reduced movement of the shoulder, which results in adhesive capsulitis (colloquially referred to as frozen shoulder).  Several surgical procedures including closed manipulation under anesthesia, arthroscopic release of adhesions, or open release of adhesions have had good results in the treatment of recalcitrant adhesive capsulitis.[14]  The fact that petitioner has declined either steroid injections or surgical release of adhesions in her shoulder suggests both that her pain may be less severe than described and that she may be able to limit the duration of her injury by pursuing well known treatments.

I have also considered the extent to which petitioner's SIRVA has impacted her life.  The record reflects that at least fifteen (15) years prior to her vaccination, petitioner was diagnosed with chronic fatigue syndrome as well as fibromyalgia with trigger points, headaches, and insomnia.  She relied on her husband and occasional hired help to complete most household responsibilities.  She passed most of her time resting at home, with the exception of short trips outside to get air or to attend doctors' appointments.  *See* Pet. Ex. 23 at 19-20.  The Social Security Administration adjudged her impairments to be sufficiently severe to render her incapable of performing any work available in the national economy and therefore eligible for Social Security Disability (SSD) payments.

There is a gap between the filed SSD records which end in approximately 2002 and the medical records filed in support of the petition which begin in approximately 2012 (three years prior to the vaccination).  However, petitioner's condition did not change significantly.  She continued to receive SSD payments (and does to this day).  She continued to have the same diagnoses and continued to complain of severe fatigue, fibromyalgia with trigger points, and insomnia.  *See, e.g.*, Pet. Ex. 2 at 88-89 (June 23, 2015 primary care record); *id.* at 81-83 (October 20, 2015 primary care record).  Petitioner testified that by the time of the vaccination, she was doing some simple household tasks such as light vacuuming and dusting as well as cooking some meals, not more than two dinners per week.  Tr. 81-84.  Her husband testified that

---

[14] D'Orsi et al., *Treatment of adhesive capsulitis: a review*, 2 Journal of Muscle and Ligaments 70 (2012), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3666515/.

because of her pre-existing conditions, he was "doing most of the shopping" and the "heavy-duty homework", in addition to his full-time employment. Tr. 102-06. Accordingly, the evidence submitted reflects that petitioner was significantly disabled prior to the October 23, 2015 flu vaccination.

The evidence submitted also reflects that after receiving the October 23, 2015 flu vaccination, petitioner experienced shoulder pain within 48 hours, followed by decreased range of motion within the following few months. This SIRVA understandably caused stress as well as the need for additional medical appointments and monitoring to keep the arm active, but not too active, as described by Dr. Ramundo. Tr. 40-41.

The SIRVA made it difficult for petitioner to perform self-care tasks such as dressing herself and brushing her hair. She also had new difficulty with other activities of daily living such as lifting her arm overhead, lifting objects, and fastening her seat belt. But as noted above, I do not see preponderant evidence that petitioner was doing many activities requiring those functions beforehand. Importantly, petitioner's SIRVA is in her non-dominant left arm which should also reduce its impact on her life. She has not described significant loss of other activities above and beyond any that may have been limited by her pre-existing disability.

Since December 2016, petitioner has also contended with pain in her mid- to low back, which she has described as being equally painful and disruptive to her sleep. The medical records filed reflect that petitioner has consistently taken NSAIDS, sought medical evaluations, undergone imaging, and participated in physical therapy and chiropractic treatment to treat *both* her SIRVA and her back pain. I find that the back pain is also significant to petitioner's overall pain picture and limits her argument that her current limitations are all due to the SIRVA.

I recognize that petitioner's SIRVA has caused pain and some additional limitation of function and that she does continue to pursue physical therapy and self-treat with homeopathic medications which she finds helpful. Petitioner has experienced SIRVA in her non-dominant arm for five years. Based on all of the evidence, I find that it is appropriate to award $75,000 in past pain and suffering.

I also find preponderant evidence that petitioner's SIRVA is now chronic. With regular physical therapy, she has improved her range of motion to near normal. *See, e.g.*, Pet. Ex. 11 at 47. Her baseline pain is "mild", but increases with activity. Petitioner will likely need to continue either physical therapy or a consistent home exercise program to maintain her current range of motion, while avoiding overuse that would cause significantly increased pain. Accordingly, I find it reasonable to award petitioner future pain and suffering in the amount of $1,000 per year for her remaining life expectancy of 25 years[15], reduced to net present value (which is discussed further below).

---

[15] Petitioner was born on January 28, 1959. Her life expectancy is 86.1 years. *See* Ct. Ex. 2 (ECF No. 77-1) –Social Security Administration, *Retirement & Survivors Benefits: Life Expectancy Calculator.*

## II.      Past Unreimbursed Expenses

A Vaccine Program claimant may recover past actual unreimbursed expenses which "(i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary." 42 U.S.C. § 300-aa(15)(a)(1)(B).  The petitioner bears the burden of showing that their requested costs are reasonably necessary.  *See, e.g., Brewer v. Sec'y of Health & Human Servs.,* No. 1996 WL 147722, *13 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

Here, petitioner requested $4,347.61 in unreimbursed expenses, specifically for the portion of medical bills that were not covered by Medicare.  *See generally* Pet. Ex. 18.  I find preponderant evidence that these expenses were related to her left shoulder injury, that they were incurred by petitioner, and that they were reasonably necessary for the treatment of her left shoulder injury.  Accordingly, they will be awarded.

## III.      Future Unreimbursed Expenses

The Vaccine Program may also award actual unreimbursed expenses which are "reasonabl[y] projected" to be incurred in the future.  42 U.S.C. § 300-aa(15)(a)(1)(A)(iii)(II). Future unreimbursed expenses should be awarded to a degree "beyond that which is required to meet the basic needs of the injured person…but short of that which may be required to optimize the injured person's quality of life.  What is reasonably necessary lies somewhere between that which is 'indispensable' and that which is 'advantageous.'"  *Scheinfeld v. Sec'y of Health & Human Servs.*, No. 90-212V, 1991 WL 94360, at *2 (Fed. Cl. Spec. Mstr. May 20, 1991), cited in *Curri v. Sec'y of Health & Human Servs.*, 2018 WL 6273562, at *4 (Fed. Cl. Spec. Mstr. Oc. 31, 2018).

Here, in anticipation of a combined hearing on entitlement and damages, petitioner filed a proposed life care plan (Pet. Ex. 27), to which respondent filed a response (Resp. Ex. A). Following a pre-hearing status conference, I offered my tentative conclusions by way of annotations to respondent's life care plan.  Scheduling Order filed May 1, 2020 (ECF No. 77), attaching Court's Exhibit (Ct. Ex.) 1.  After the hearing, I provided calculations of the damages. Scheduling Order filed May 28, 2020 (ECF No. 83).

As reflected therein, petitioner will not be awarded the cost of future premiums for standard Medicare or Medicare Part D.  Pet. Ex. 27 at 2; Ct. Ex. 1 at 1; Scheduling Order (ECF No. 83).  She is awarded $198.00 per year for the Medicare Supplemental Part B annual deductible.  *Id.*  Starting at age 65, she will be awarded $1,626.24 per year for Medicare Supplemental Part B premiums.  *Id.*

While it was inadvertently omitted from the May 28, 2020 scheduling order, petitioner is awarded $108.00 per year to cover the deductible for four visits per year with Dr. Ramundo until she reaches 65 years of age, after which the Medicare Supplemental Part B plan will fully cover the visits with Dr. Ramundo.  Pet. Ex. 27 at 2; Ct. Ex. 1 at 2.

Petitioner also requested her co-share of twenty per cent (20%) of $150.00 per physical therapy session, to occur once or twice a week, fifty (50) weeks per year.  Pet. Ex. 27 at 2. Respondent recommended reimbursement for thirty (30) physical therapy sessions per year, on the grounds that petitioner also undergoes physical therapy for her back and lower extremities. As it is difficult to divide the cost of a single physical therapy visit between her shoulder therapy and her lower back therapy, I generally agree that the approach suggested by the respondent's approach and award $950 per year, which roughly represents the 20% co-share for approximately thirty-two (32) physical therapy sessions per year, until petitioner turns 65 years old.  At that point, physical therapy will be covered by the Medicare Part B plan addressed above.

The chiropractic "problem list" includes petitioner's left shoulder, although that was not examined often and seems to be less of a focus than her back pain.  Regardless, the chiropractic treatment is fully covered by Medicare and does not result in out-of-pocket costs.  Accordingly, chiropractic treatment is not included in the award for future unreimbursed expenses.  Pet. Ex. 27 at 2; Ct. Ex. 1 at 2.

Petitioner requested $305.20 per year for the homeopathic treatments of milk thistle, Boswellia, B complex, and turmeric root.  Pet. Ex. 27 at 3.  Respondent opposed reimbursement for these medications on the ground that petitioner had already been on homeopathic medications for many years and that these are not specifically indicated or proven to be effective for her shoulder condition.  Resp. Ex. A at 2.  I tended to agree with respondent's life care plan that it was not clear that these medications were specifically for petitioner's shoulder injury, however, a reasonable compromise might be $100.00 per year.  Ct. Ex. 1 at 3.  Upon review, these alternative treatments – at least the B complex and turmeric root extract – are listed as medications in petitioner's medical records relating to her left shoulder since at least June 2017. Gage Ex. 10 at 6.  Petitioner testified that they seem to be effective in treating her left shoulder pain and inflammation.  Tr. 67.  She also testified that these are in place of the prescription NSAID meloxicam, with which she has experienced side effects such as nosebleeds and nausea. Tr. 66-67; *see also* Pet. Ex. 14 at 19.  Based on this further review of the medical records and the testimony, I find that petitioner's treating providers have at least recorded the homeopathic medications as a treatment for her left shoulder injury in addition to her other conditions. Additionally, petitioner is no longer taking the prescription medication meloxicam.  Thus, petitioner is awarded $100.00 per year, to cover the approximate portion of the homeopathic medications with which she reports some relief for her shoulder pain and inflammation.

Petitioner's life care planner proposed a housekeeper for deep cleaning at the cost of $150.00 per visit, twenty-four (24) times per year, for a total cost of $3,600.00 per year.  Pet. Ex. 27 at 3.  Respondent opposed any reimbursement for house cleaning, on the grounds that the Vaccine Program provides compensation for only the injured party, not for routine home maintenance, and that petitioner was not doing the majority of household maintenance prior to

her shoulder injury.  Resp. Ex. A at 3.  Though I had at one point considered awarding petitioner the cost of house cleaning once per month, the records and the testimony do no support such an award because they have not "resulted from the vaccine-related injury" and they are not "reasonably necessary" to manage the injury.  42 U.S.C. § 300-aa(15)(a)(1)(B).  Petitioner's own statements that she was doing only some light cleaning and dusting prior to the vaccination were consistent with her husband's statements that he was doing the majority of the house maintenance even before her vaccination.  Additionally, the earlier SSD records which reflect that the household maintenance was done primarily by the husband and occasionally by hired help.  Accordingly, petitioner is not awarded the costs of future housekeeping.

Petitioner also requested dumbbells, resistance bands, a sleep pad, hot and cold packs, one-handed assistive devices, and a TENS unit (which delivers transcutaneous nerve stimulation for symptomatic relief of chronic pain). Pet. Ex. 27 at 3; Pet. Ex. 28.  Respondent does not challenge the reasonable necessity of any items except for the TENS unit, on the grounds that it was ordered by the physical therapist "for disuse and atrophy in lower extremities secondary to low back pain".  Resp. Ex. A at 2; citing generally to Pet. Ex. 14.  Upon review, the physical therapy records repeatedly state: "Pt will benefit from HOME NMES [presumably neuromuscular electrical stimulation, e.g., a TENS unit] *for low back* at home to increase muscle strength."  *See, e.g.*, Pet. Ex. 14 at 2, 8, 10, 12, 14, 16 (emphasis added).  But those same records reflect that the physical therapist applied electrical stimulation to both the left shoulder and low back.  Additionally, Dr. Ramundo recorded that the electrical stimulation was helpful for her left shoulder pain and prescribed use of a TENS unit at home.  *Id.* at 3.  Accordingly, I find that petitioner shall be awarded a one-time cost for exercise equipment, sleep pad, hot and cold packs and a TENS unit at $600, then $155 per year for replacement costs.  Assistive devices are generally quite helpful for people with physical disabilities and I award $100 per year for such.

## IV.    Reduction to Net Present Value

The Vaccine Act requires that any award of compensation relating to future damages shall be reduced to its net present value.  42 U.S.C. § 300aa-15(f)(4)(A).  This reduction generally has the effect of awarding a lump sum that, if prudently invested, will provide petitioner with an amount equivalent to his or her future damages.  *Brown v. Sec'y of Health & Human Servs.,* No. 00-0182V, 2005 WL 2659073, at *2 (Fed. Cl. Spec. Mstr. Sept. 21, 2005); *see also Petronelli v. Sec'y of Health & Human Servs.,* No 12-285V, 2016 WL 3252082, at *3 (Fed. Cl. Spec. Mstr. May 12, 2016).

The Supreme Court has noted that in almost any case, calculating the loss of future wages could become the subject of reasonable debate. *See Monessen Southwestern Railway Co. v. Morgan*, 486 U.S. 330, 351 (1988). The Court counseled against allowing the average personal injury trial to become a graduate seminar on economic forecasting.  *Id.* at 341.  In another case, after reviewing the advantages and disadvantages of the various calculation methods, the Court found the "economic evidence distinctly inconclusive" and concluded that: "we do not believe a trial court adopting such an approach in a suit . . . should be reversed if it adopts a rate between one and three percent and explains its choice." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 548-49 (1983).

There are numerous Vaccine cases where special masters have analyzed the appropriate discount rate to apply to future damages.  *See, e.g., Childers v. Sec'y of Health & Human Servs,* No. 96-194V, 1999 WL 218893 (Fed. Cl. Spec. Mstr. Mar. 26, 1999); *Brown*, 2005 WL 2659073; *Petronelli,* 2016 WL 3252082; *Neiman v. Sec'y of Health & Human Servs.,* No 15-631V, 2016 WL 7741742 (Fed. Cl. Spec. Mstr. Oct 31, 2016); *Curri,* 2018 WL 6273562; *Schoover v. Sec'y of Health & Human Servs.,* No. 16-1324V (Fed. Cl. Spec. Mstr. Aug. 5, 2020).

Here, I considered that the challenge for petitioner is to be able to take a lump sum of money awarded to her at this time and invest conservatively by purchasing a laddered portfolio of U.S. Treasury bonds that would provide her with a return sufficient to offset a reduction to present value and provide security of the principal.  Consulting the official site of the U.S. Department of Treasury on October 28, 2020, I found that the rate of interest on a six-month treasury bond is 0.11%.  The rate for a one-year bond is 0.12%, for a 2 year note 0.16%, for a 5-year bond it is 0.34%, for a 10-year bond 0.79% and for a 30 year note 1.57%.[16]  Obviously, the ability to obtain even a 1% return at the present time in any of the shorter maturities is non-existent.  Given the historically low interest rates of the present day, it is likely that rates will be at least somewhat higher in the out years of the twenty-five year future damage award in this case, I am adopting a multipronged approach, as I did in *Petronelli* and as adopted by other special masters in this Program.  Consistent with the other rulings within the Vaccine Program and well within the 1% to 3% standard suggested by the Supreme Court in *Jones & Laughlin Steel Corp.,* I hereby find that the reduction to present value should be calculated at a rate of 1% for the first 15 years of petitioner's future damages, with a discount rate of 2% in the remaining years.  A growth rate of 3% shall be applied throughout.

I initially performed the calculations to reduce many of the above amounts to present value using an online calculator[17] in order to save the cost and time involved with having the parties hire economist(s) to perform the task.  Petitioner has now hired an economist, Mark McNulty, Ph.D., who has reviewed my calculations and questions the accuracy of the calculator in computing the out year damages.  Additionally, since I performed my calculations, some of the underlying figures for future damages have changed.  I have also made an award for future pain and suffering which also needs to be reduced to net present value.  Therefore, the parties shall calculate the future damage figure including growth rate and reduction to present value within 30 days.

## V.    Conclusion

After a review of the record as a whole, I find that petitioner should be awarded:

| | |
|---|---|
| **Past Pain and Suffering** | **$75,000.00** |
| **Future Pain and Suffering** | **$25,000.00** |

---

[16] Daily Treasury Yield Curves, available at https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/textview.aspx?data=yield (last accessed October 28, 2020).

[17] Brown Economic Consulting, Inc., *Present Value Damages Calculator,* https://www.brownecon.com/bea_calculators/pvcalc/default.asp (last accessed October 28, 2020).

| Past Unreimbursed Expenses | $4,347.61 |
|---|---|

***Future Unreimbursed Expenses***

| | |
|---|---|
| **Medicare Deductible** | **$198.00 per year to age 65** |
| **Medicare Supplement Plan G** | **$1,626.24 per year beginning at age 65 for life** |
| **Homeopathic medications** | **$100.00 per year for life** |
| **Dr. Ramundo deductible** | **$108.00 per year to age 65** |
| **Physical Therapy Deductible** | **$960.00 per year to age 65** |
| **Exercise equipment, TENS, etc.** | **$600.00 one-time acquisition cost and $155.00 per year replacement costs for life** |
| **One-Hand Assistive Devices** | **$100.00 per year for life** |

The future pain and suffering and the future unreimbursed expenses are awarded for petitioner's remaining life expectancy of 25 years (unless otherwise stated above).  The future pain and suffering and the future unreimbursed expenses are subject to the application of a growth factor and reduction to present value in accord with the directions stated above.

It is hereby **ORDERED** that the parties shall file a joint status report providing the net present values of petitioner's future pain and suffering and future unreimbursed expenses within **30 days, by Wednesday, December 2, 2020**.  A damages decision will be issued following the status report.

**IT IS SO ORDERED.**

<u>s/Thomas L. Gowen</u>
Thomas L. Gowen
Special Master